CASE 2.—ACTION BY THE IMPERIAL TOBACCO COMPANY
OF KENTUCKY AGAINST THE SPRING GARDEN
INS. CO., THE CONNECTICUT FIRE INS. CO., THE
CALEDONIAN INS. CO., THE HANOVER FIRE INS.
CO. AND THE PENNSYLVANIA FIRE INS. CO. TO
RECOVER LOSS BY FIRE—February 10.

## Spring Garden Ins. Co. v. Imperial Tobacco Co.

Appeal from Caldwell Circuit Court.

J. F. GORDON, Circuit Judge.

Judgment for plaintiff.   Defendants appeal.—Reversed.

1. Pleading—Demurrer—Effect.—Where demurrers are interposed
    to answers, the facts stated in the answers must be taken
    as true.
2. Contracts—Construction—Use of Words.—Words in a contract
    must be interpreted according to their ordinary and popular
    sense, unless from the context it appears to have been the
    intention of the parties that they should be understood in
    a different sense or by the usage of trade or the custom of
    the country they have and were understood by the particular
    or peculiar meaning as distinguished from their ordinary
    meaning.
3. Insurance—Construction of Policies.—In the construction of
    insurance policies, the same rules obtain as do in the con-
    struction of other contracts, except that a policy will be
    construed in favor of the insured so as not to defeat, without
    plain necessity, his claim to the indemnity, which in taking
    the insurance it was his object to secure, and, where words
    are fairly susceptible of two interpretations, that which will
    sustain his claim must be adopted.
4. Insurance—Construction of Policies—Intention of Parties.—In
    the construction of insurance contracts as well as others, the
    intention of the parties is to be gathered from an inspection
    of the entire instrument and all parts of it, and all words
    employed should be given meaning and effect if possible.

5. Insurance—Construction of Policy—Fire Policy—Exceptions—
"Riot."—An insurance policy recited that the insurance com-
pany insured certain property against "all direct loss or dam-
age by fire, except as hereinafter provided;" the quoted words.
appearing in large printed letters in the body of the policy
and as a part of the insuring clause. In small printed letters.
in the body of the policy were recited exceptions that would.
relieve the company from liability, among them: "This.
company shall not be liable for loss caused directly or in-
directly by * ~ * riot * * *" Held, that, as the insur-
ance was solely against fire, the words "except as hereinafter·
provided" referred to the words "against all direct loss or dam-
age by fire," and exempted the company from liability for·
destruction of the insured property by fire as the result of a..
riot. There being no statute defining or describing a riot,
the common law must be looked to for a definition, according·
to which a riot is a tumultuous disturbance of the peace by·
three persons or more assembling together of their own au--
thority with an intent mutually to assist each other against any
who shall oppose them in the execution of some enterprise of.
a private nature, and afterwards actually executing it in a.
violent and turbulent manner, to the terror of the people,
whether the act intended were of itself lawful or unlawful;·
and hence where a body of 100 or more men armed and dis--
guised, unlawfully confederated and banded together for the.
purpose of destroying property of an individual, and in pur-
suance of the unlawful conspiracy burned it, and at the same·
time intimidated and terrorized the inhabitants and civil au--
thorities, the fire which burned the property was caused by a.
riot.

BERNARD FLEXNER for appellants.

CHARLES H. SHIELD, J. WHEELER CAMPBELL, THOMAS:
BATES of counsel.

POINTS AND AUTHORITIES.

1. The invasion of Princeton, Ky., on the night of November·
30, 1906, or nearly morning of December 1, 1906, was a riot. The
term "riot" and "mob" are synonymous: (Prather v. City of Lex-
ington, 13 B. M. 559; Ward v. City of Louisville, 16 B. M. 184;
Criminal Code, section 575; Ky. Stats., section 9; City of Madison-.
ville v. Bishop, 23 Ky. Law Rep. 2364; Marshall v. City of Buffalo,.
50 N. Y. App. 149, 6 N. Y. Supp. 411; Lycoming Fire Ins. Co. v.
Schwenk, 95 Pa. St. 89 (40 Am. Rep. 629); German Fire Ins. Co.

v. Deckard, 28 N. E. 868; Dupin v. Mutual Ins. Co., 5 La. Am. 482; Century Dictionary; Webster's Dictionary; Hawkins Pleas of Crown, c. 65, section 9; Follis v. State (Tex.), 40 S. W. 277; Aaron v. City of Wausau, 74 N. Y. 354; Words and Phrases, vol. 7, p. 624; State v. Brazil (S. C.), Rice 257; State v. Sims, 16 S. C. 486; Bouvier's L. D. 248 and 599; Am. & Eng. Ency. of Law, vol. 15, p. 698; State v. Snow, 18 Me. 346; State v. Boies, 34 Me. 235; Darst v. People, 51 Ill. 286; Bell v. Mallory, 61 Ill. 167; U. S. v. Stockwell, 4 Cranch 671; U. S. v. Fenwick, 4 Cranch 675; County of Allegheny v. Gibson, 90 Pa. St. 397; People v. Judson, 11 Daly 1.)

2. The difference between incendiarism and the act of the mob is that in one case the constituted authorities are not prevented by the destroying agent from interferring, while in the other case the destroying agent at one and the same time commits the act and overpowers the authorities, thereby preventing interference. (Century Dictionary; Bouvier's Dictionary; Straus v. Imperial Fire Ins. Co., 94 Mo. 182, 4 Am. St. Rep. 369.)

3. Policies of insurance should be construed rationally, according to the subject, object and plain intent, and that construction should be followed which will uphold the contract as a whole. (Montgomery v. Fireman's Ins. Co., 16 B. M. 427; Michigan Fire Co. v. Stein, 5 Bush 659; Aetna Ins. Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395.)

4. The phrase "except as hereinafter provided" following the main promise insuring against direct loss or damage by fire, is a limitation upon the causes of fire insured against. (Yoch v. Insurance Co., 111 Cal. 503 (510).

5. The "riot" clause of the Standard Fire Insurance policy exempts the companies from the payment of the losses sued on. (Montgomery v. Fireman's Ins. Co., 16 B. M. 427; Michigan Fire & Marine Ins. Co. v. Whitelaw, 1 Ohio Cir. (new series) 412; S. C. affirmed, 73 Ohio St. Ct. 365; Conner v. Manchester Assurance Co., 130 Fed. 743; Imperial Fire Ins. Co. v. Fargo, 95 U. S. 227, 24 L. Ed. 430; St. John v. American Fire Ins. Co., 1 Kernan (N. Y.) 516; Willard v. Williamsburg City Fire Ins. Co., C. C. A. Ninth Circuit, decided November, 1908, 164 Fed. 404; Baker v. City Fire Insurance Co., 157 Fed. 281; Lycoming Insurance Co. v. Schwenck, 95 Pa. St. 90, 40 Am. Rep. 629.)

6. The Standard Fire Insurance policy must be construed with reference to previous decisions. It is a New York contract and regard must be had, therefore, for the decisions of the New York courts prior to its adoption. (Waldradt v. Phoenix Ins. Co. (N. Y.), 32 N. E. 1065; John Davis v. Ins. Co. (Mich.), 73 N. W.

Spring Garden Ins. Co. v. Imperial Tobacco Co.

392; Matthews v. Ins. Co. (N. Y.), 48 N. E. 753; Clement on Insurance, vol. 1, 451.)

7. The riot was the proximate cause of the loss. (Insurance Co. v. Tweed, 7 Wallace (U. S.) 44; Aetna Insurance Co .v. Boon, 95 U. S. L. Edn. 398-9; Barton v. Home Insurance Co., 42 Am. Dec. 329, 55 Ohio St. 581; Germania Fire Ins. Co. v. Roost, 36 L. R. A. 238.)

8. The insurer is liable for all damage inevitably flowing from the fire, such as theft, water, smoke. (Sklencher v. Insurance Co., 60 Atl. 232; Webb v. Protection Ins. Co., 14 Mo. 3; Babcock v. Montgomery, 6 Barb. 640; Case v. Hartford Ins. Co., 13 Ill. 676.)

9. Subrogation arises only in cases where the insurer is liable. (24 Am. & Eng. Ency. 187; Allen v. Perrine, 103 Ky. 521; Joyce on Insurance, vol. 4, 3537; Ostrander on Insurance, par. 131; Chicago, etc., R. R. v. Pullman, 139 U. S. 79, 35 L. Ed. 96.)

10. Cases examined and distinguished. Barton v. Home Ins. Co., 97 Am. Dec. 329; Straus v. Imperial Ins. Co., 4 Am. St. Rep. 369; Germania Ins. Co. v. Deckard, 28 N. E. 868; Commercial Ins. Co. v. Robinson, 64 Ill. 255, 16 Am. Rep. 557; Heffron v. Kittaining Ins. Co., 20 Atl. 698; Boatman's F. & M. Ins. Co. v. Parker, 23 Ohio 85, 10 Am. Rep. 228.)

YEAMAN & YEAMAN for appellees.

### POINTS AND AUTHORITIES.

1. It is no defense to a suit on a policy of fire insurance in which the payment of the premium is acknowledged, to allege that the premium has not in fact been paid, and a demurrer to that defense was properly sustained. (Ostrander on Insurance, section 87; Joyce on Insurance, section 79; Cooley's Briefs on Insurance. vol. 1, pp. 507 and 509; Mississippi, etc., Co. v. Newland, 9 Bush 435; Commonwealth, etc., v. Grogan, 21 Ky. Law Rep. 517, 5 S. W. 959; Pelican, etc., Co. v. Schiednecht, 108 S. W. 312.)

2. These suits are upon policies of insurance against loss to tobacco by fire. The policies contain this clause: "This company shall not be liable for loss caused directly or indirectly by invasion, insurrection, riot, civil war or commotion, or military or usurped power, or by order of any civil authority; or by theft; or by neglect of the insured to use all reasonable means to save and preserve the property at and after a fire, or when the property is endangered by fire in neighboring premises; or (unless fire ensues, and, in that event, for the damage by fire only) by explosion of any kind, or lightning; but liability for direct damage by lightning may be assumed by specific agreement hereon."

Spring Garden Ins. Co. v. Imperial Tobacco Co.

The defenses are, in substance, that the property was set on fire and burned in the night-time by a number of persons who were armed and masked—commonly called "Night Riders."

3. The answers of the insurance companies do not set forth a state of case constituting a "riot" within the meaning of the excepting clause quoted above, and the demurrer to that defense was properly sustained. (Drinkwater v. Corporation, etc., 2 Wilson 663; Langdale v. Mason, 2 Marshall on Insurance 791 (both cases in Park on Insurance, 502-511); Madisonville v. Bishop, 113 Ky. 106.)

4. There are two standard forms of policies in use by fire insurance companies, in one of which the words "by fire" are inserted in the clause corresponding to the excepting clause in these cases, so that that clause reads: "This company shall not be liable for fire caused by invasion, riot, etc. In the other form the words "by fire" are omitted, so that the clause reads, as in these cases, "This company shall not be liable for loss caused * * * by invasion, riot, etc." (Cooley's Briefs on Insurance, vol. 4, p. 3020.)

5. Fire insurance policies are strictly construed against the insurer, and especially are all ambiguities in clauses containing exceptions from the liability they have assumed, resolved against the insurer. (May on Insurance, 2 Ed., section 17; Joyce on Insurance, section 221; Chandler v. St. Paul, etc., Ins. Co., 21 Minn. 85, 18 Am. Rep. 385; Mouler v. American, etc., Ins. Co., 111 U. S. 341; Aetna v. Jackson, 16 B. M. 242 (p. 259); American, etc., Co. v. Rergart, 94 Ky. 548; Mutual, etc., Co. v. Dunn, 106 Ky. 591.)

6. The policies sued on are against "all direct loss or damage by fire," and the clause in question does not exempt the insurers from loss by fire caused by invaders, rioters, etc.—as does one from of policy, but only exempts the insurers from loss caused by invaders, rioters, etc. (Lycoming, etc., Co. v. Swenk, 95 Pa. St. 89, 40 Am. Rep. 629; Straus v. Imperial, etc., Co., 94 Mo. 182, 4 Am. St. Rep. 369; Barton v. Home, etc., Co., 42 Mo. 156, 97 Am. Dec. 329; Germania, etc., Co. v. Deckard, 28 N. E. 868; Commercial Ins. Co. v. Robinson, 64 Ill. 266, 16 Am. Rep. 557; Germania, etc., Co. v. Roost, 55 Ohio·St. 581, 60 Am. St. Rep. 711; Hefron v. Kittaning, etc., Co., 132 Pa. St. 580, 20 Atl. 698; Western, etc., Co. v. Cropper, 32 Pa. St. 351, 75 Am. Dec. 561; City, etc., Co. v. Corlies, 21 Wendell 367, 34 Am. Dec. 259; N. Y., etc., Co. v. Traders, etc., Co., 132 Mass. 377, 42 Am. Rep. 440; Kenniston v. Ins. Co., 14 N. H. 341, 40 Am. Dec. 193; Lieber v. Ins. Co., 6 Bush 641; Insurance Co. v. Pence, 93 Ky. 96; Campbell v. Merchants, etc., Co., 37 N. J. 35, 72 Am. Dec. 324.)

7. If there is a difference of opinion in the construction placed by different courts upon the clause in question, the weight of

authority and reason is on the side of the construction which holds the insurer liable. Joyce discusses the particular clause in question. (Joyce on Insurance, section 2592.)

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

These several appeals involve the same questions of law. The litigation grows out of the refusal of the appellant insurance companies to pay the amount of fire policies issued to the appellee tobacco company. The refusal of the companies was rested upon the ground that the property insured was destroyed by fire caused by a "riot," and hence they were not liable because of clauses in the policies that exempted them from liability for fire resulting from such cause. The policy issued by each company contains the same conditions and exceptions. They are what is known as the "Standard Fire Insurance Policy of the States of New York, New Jersey, Connecticut, and Rhode Island," and stipulate that the company insures the property of the appellee tobacco company against "all direct loss or damage by fire, except as hereinafter provided." These words appear in large printed letters in the body of the policy and as a part of the insuring clause. In small printed letters in the body of the policy are the exceptions that relieve the company from liability. Among these exceptions, and in a separate clause, is the following: "This company shall not be liable for loss caused directly or indirectly by invasion, insurrection, riot, civil war or commotion, or military or usurped power, or by order of any civil authority; or by theft; or by neglect of the insured to use all reasonable means to save and preserve the property at and after a fire, or when the property is endangered by fire in neighboring prem-

ises; or (unless fire ensues, and, in that event, for the damage by fire only) by explosion of any kind, or lightning; but liability for direct damage by lightning may be assumed by specific agreement hereon.'' The defense relied upon was presented in answers, to which a general demurrer was sustained; and, declining to plead further the petitions were taken as confessed and judgments entered for the full amount claimed by the insured.

So much of the answers to which a demurrer was sustained as is material to the questions involved reads as follows:

"This defendant further says that said policy of insurance was issued by it to the plaintiff and accepted by the plaintiff as aforesaid, and provides that it does insure the Imperial Tobacco Company of Kentucky for the term of one year from the —— day of November, 1906, at noon, to the —— day of November, 1907, against all direct loss or damage by fire, except that said company shall not be liable for loss caused directly or indirectly by invasion, insurrection, riot, civil war, or commotion, or military, or usurped power, or by order of any civil authority, and this defendant avers and charges the fact to be that said loss mentioned and set forth in the plaintiff's petition was caused directly or indirectly by invasion, riot, or commotion or usurped power, in violation of the terms and provisions of said policy, and that under the express terms and conditions of said policy the same thereby became and at the time of the bringing of this suit and at all times after said fire occurred was and is wholly null and void.

"This defendant further says that all of the property mentioned and described in said petition, and which is described in and by said policy of insurance,

was destroyed and burned by fire on the night of
November 30, 1906, or early in the morning of Decem-
ber 1, 1906, by reason of an invasion, riot, and com-
motion and usurped power within the true intent and
meaning of said provision contained in said policy
of insurance above set forth, and that said property
was destroyed and burned as aforesaid by a large
body of men, about 100 or more in number, who
invaded the city of Princeton, Ky., on said night of
November 30, 1906, or morning of December 1, 1906,
and who were armed and disguised at the time of said
invasion, and who unlawfully conspired and confed-
erated and banded themselves together for the pur-
pose and with the intention of destroying all the prop-
erty mentioned and described in the plaintiff's peti-
tion, including the three and one-story, brick and
frame, metal roof, building, and its contents, con-
sisting of tobacco in bulk and in packages, and de-
scribed in the petition, and being the property re-
ferred to in the petition as well as a large amount of
other property located in said city of Princeton and
owned by numerous other parties, and that, in pur-
suance of said conspiracy, confederation, and unlaw-
ful purpose, on the night of November 30, 1906, or
morning of December 1, 1906, said large body of men
armed and disguised and banded together as afore-
said for the purpose of destroying the property de-
scribed in plaintiff's petition, as well as a large
amount of other property in said city of Princeton,
invaded the city of Princeton, Ky., and took forcible
possession of the police station, and the police force
of said city, and also surrounded and took forcible
possession of the fire department of said city of
Princeton, Ky., and also surrounded and took forcible
possession of the town hall of said city of Princeton,

Ky., and of all telegraph and telephone offices in said city of Princeton, and by the numbers and strength of said invaders they overawed and intimidated and terrorized and usurped the power of the civil authorities of said city, and took forcible possession of said civil authorities and of the civil administration of said city, and also of the inhabitants and citizens thereof, and by use of their firearms said mob did hold up, overawe, intimidate, terrorize, and utterly subject and usurp the power of the civil authorities as well as the inhabitants of said city of Princeton to their unlawful control, and, after doing this, proceeded to the property of the plaintiff, as well as to large amount of other property in said city of Princeton, and tore down, dynamited, blew up, shot into, and destroyed and burned the property of said plaintiff, as well as the property of other citizens of said city of Princeton, Ky., all of said acts being committed and commotion being created in an unlawful and riotous manner by said large body of men who invaded said city of Princeton for the purpose of creating said riot and of destroying said property.''

Two questions are presented for our consideration: First. Was the fire that produced the loss caused by ''riot?'' Second. If this be admitted, do the conditions in the policies relieve the companies from liability for loss thus caused.

Taking up these questions in the order named, we will first determine whether or not the fire was caused by ''riot,'' and in considering this question the facts stated in the answers to which demurrers were sustained must be taken as true; so that, accepting these facts as true, do they constitute a ''riot'' within the meaning of that term as used in the policies? Curiously enough, we have no statute defining or describ-

ing a ''riot,'' although it is mentioned in section 1268 of the Kentucky Statutes of 1903 as a punishable misdemeanor; and sections 375 and 381 of the Code of Criminal Practice contain provisions for the dispersement and quelling of riotous assemblies. Nor do we find any decision of this court in which the word has received judicial construction. We must, therefore, look to the common law for a definition of its meaning and a description of the acts that will constitute a riot. In the common-law authorities there is no substantial disagreement concerning the definition of a riot. In 4 Blackstone (Chitty's Ed.), p. 147, we find the following: ''A 'riot' is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel, as, if they beat a man, or hunt and kill game in another's park, chase, warren, or liberty, or do any other unlawful act with force and violence, or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner.'' In 1 Russell on Crimes, p. 265, an old English work of high repute, the author states: ''A 'riot' is described to be a tumultuous disturbance of the peace by three persons or more, assembling together of their own authority, with an intent mutually to assist one another against any who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful. * * * It seems to be agreed that the injury or grievance complained of and intended to be revenged or remedied by a riotous assembly must relate to some private quarrel only, * * * or such like matters relating to the interests or disputes of particular persons in no way concerning the public. It

seems to be clearly agreed that in every riot there must be some such circumstance, either of actual force or violence, or at least of an apparent tendency thereto, as are naturally apt to strike a terror into the people. * * * But it is not necessary, in order to constitute this crime, that personal violence should have been committed. * * * But the violence and tumult must be in some way premeditated; for if a number of persons being met together at a fair, market, or any other lawful or innocent occasion happen on a sudden quarrel to fall together by the ears, it seems to be agreed that they are not guilty of a riot, but only of a sudden affray. * * * But, if there be any predetermined purpose of acting with violence and tumult, the conduct of the parties may be deemed riotous.'' This definition is also found in 1 Hawkins, Pleas of the Crown, p. 513. Webster defines a riot to be ''the tumultuous disturbance of the public peace by an unlawful assembly of three or more persons in the execution of some private object.'' And Bouvier in his Law Dictionary as ''a tumultuous disturbance of the peace by three persons or more, assembling together of their own authority, with an intent mutually to assist each other against any who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful.'' The common-law definition of a riot is generally approved by modern text-writers on the subject of criminal law. Thus Bishop in his work on Criminal Law (volume 2, sections 1143, 1149), although he makes slight criticism of the definition laid down by Russell on Crimes, says: ''A riot is such disorderly conduct in three or more assem-

bled persons, actually accomplishing an object, as is calculated to terrify others. * * * The act of the rioters need not be such as it would be unlawful for one to perform. Whether in this sense lawful or unlawful, if it is done by three or more in a turbulent manner, calculated to excite terror, it is·a riot." Wharton in his work on Criminal Law _(volume 2, sections 1537, 1544), defines a riot as "a tumultuous disturbance of the public peace by an unlawful assembly of three or more persons in the execution of some private object. * * * It must be also shown in riot ·that the assembling was accompanied with some such circumstancés, either of actual force or violence, or at least having an apparent tendency thereto, as were calculated to inspire people with terror; such as being armed, making threatening speeches, turbulent gestures, or the like. * * * To constitute a riot it is not necessary that there should be actual fright to the public generally. It is enough if the action of the parties implicated be so violent and tumultuous as to be likely to cause fright, and if individuals are frightened." These general definitions are approved in Aron v. City of Wausau, 98 Wis. 592, 74 N. W. 354, 40 L. R. A. 733; State v. Stalcup, 23 N. C. 30, 35 Am. Dec. 732; Lycoming Fire Ins. Co. v. Schwenk, 95 Pa. 89, 40 Am. Rep. 629; Dupin v. Mutual Ins. Co., 5 La. Ann. 482; Commonwealth v. Gibney, 2 Allen (Mass.) 150; State v. Snow, 18 Me. 346; State v. Hughes, 72 N. C. 27. It will thus be seen that the modern definition of a riot is in harmony with and follows the common-law definition, and that the legal meaning of the word corresponds with the meaning given to it in ordinary usage. It has no technical import as distinguished from its signification when used in the everyday

affairs of life.    If we look to either Blackstone or Webster, we have the same result.

But it is said by counsel for appellee that it would be absurd to hold that, if two persons assembled to burn a person's property in a tumultuous manner, the insurance companies would be liable for the loss, but that, if a third man joined them in the unlawful enterprise, the companies would not be liable.   Hence it is argued that the definitions noted should not control, but that a riot in the meaning of the word as used in the policies must be a condition more or less analogous in its effect to an invasion, insurrection, civil war, or usurpation of power, something aimed not at a single or several individuals engaged in a particular business, but at society as organized, having for its purpose the overturning permanently or temporarily of the existing order of things.   But, in view of the well-understood meaning of the word, it cannot be given this construction.   In using it in the policies the companies must have intended that it should have and receive the only meaning given to it by both lawyers and laymen—in short, its popular and usual meaning.   In fact, no other definition can be attached to it without going outside of the standard authorities that have treated on the subject, and doing violence to the accepted rules concerning the construction of words in a contract or writing.   It is everywhere agreed that words in a contract must be interpreted according to their ordinary and popular sense, unless from the context it appears to have been the intention of the parties that they should be understood in a different sense or by the usage of trade or the custom of the country they have and were understood by the parties to have a particular or peculiar meaning as distinguished from their ordi-

nary meaning. 17 American & English Encyclopedia of Law, p. 12; 9 Cyc. pp. 578, 583; I Chitty on Contracts, p. 113. And it may here be observed that what constitutes a riot does not depend so much on the number of persons engaged or assembled, as it does in the manner in which they act. It is the disorder, the tumult, the terrorizing, the putting in fear, the violence, the unlawful acts that are the essential things. Three armed men, banded together for the purpose of doing an unlawful act, with force and violence, acting in a tumultuous and disorderly manner, might be guilty of conduct amounting to a riot; whereas, a hundred or more, although acting in concert, in a disorderly and noisy manner and disturbing the peace, would not constitute a riot, unless some unlawful act was committed, although such a body might be an unlawful assembly. We are not, however, called upon in this case to make any nice or refined distinctions as to what number of persons, or what character of conduct, would constitute a riot if only a few were engaged in it and their actions might leave room for doubt as to whether or not what they did amounted to a riot. We can easily understand that there might be serious doubt as to whether the acts of three, or a small number of persons, or, indeed, any number, acting in concert for an unlawful purpose, would amount to a riot. Whether what they did would or not be a riot within the meaning of the definitions given would depend upon the facts and circumstances presented in the particular case. But we can say without any feeling of hesitation or sense of uncertainty that, if the facts stated in the answers do not describe a riot, it would be impossible to frame an answer that would. If a body of 100 or more men, armed and disguised, unlawfully confederated and

banded together for the purpose and with the intention of destroying the property of an individual, and who in pursuance of such unlawful conspiracy do destroy it, and at the same time intimidate, overawe, and terrorize the inhabitants and civil authorities, is not a riot, we are at a loss to know what facts it would take to constitute a riot under any definition the word has ever received.

As the riot was the direct cause of the fire, the next question is: Did the policies relieve the companies from liability? In the consideration of this feature of the case, it must be kept in mind that the policies only insured against direct loss or damage caused by fire. Loss or damage from any other cause, except lightning, was not insured against. The contract of insurance did not undertake to protect the insured against loss by riot or invasion, or insurrection, or civil war, or military or usurped power, or by order of any civil authority, or by theft; so that the words "except as hereinafter provided," following the words "against all direct loss or damage by fire," if they are to have any meaning at all, or are to be given any effect whatever, must exempt the companies from loss by fire "caused directly or indirectly by an invasion, insurrection, riot, civil war, or commotion, or military or usurped power, or by order of any civil authority," because the policies did not undertake to protect the insured, either directly or indirectly, against loss resulting from either of the causes mentioned. If the words "except as hereinafter provided" had been omitted from the contracts, then the insurance would have been against fire from any and all causes. But, not desiring to assume responsibility for all fires, the companies limited their undertaking and agreed to indemnify the insured against loss by

fire except as provided in the policies. It will thus be seen that the words "except as hereinafter provided" are material and important in their effect upon the rights of both the parties to the contracts. It would be folly to say that the purpose was to exempt the companies from loss caused by riot alone, unaccompanied by fire, when nothing but fire was insured against; as in no event and under no circumstances were the companies liable for loss by riot alone or loss not occasioned by fire. Manifestly, when the insurance was protection against fire alone, the companies could not be held liable for the injury or destruction of the property by a riot without a fire. In other words, if the rioters had torn down the building, or had carried off the property covered by the policies, or had injured or damaged it in any way, the companies would not be responsible. Therefore we again repeat that, unless it was intended by the contracts of insurance to relieve the companies from liability for fire caused by riot, the words "except as hereinafter provided" are absolutely meaningless. The companies had the unquestioned right to insert as many reasonable provisions in the policy exempting them from liability as they thought proper or necessary. We know of no rule of law that denies to insurance companies this privilege. They may limit the amount of insurance they will offer, may limit the species of property they will insure, may provide reasonable conditions that the insured must observe, as well as conditions that will in certain states of case operate as a forfeiture of the policies or waiver of the right of the insured to recover upon them, and may protect themselves from loss resulting from causes that they do not desire to offer indemnity against. Why, then, should these words by which the

companies undertook to limit their liability be stricken from the policies or ignored in their construction? They are not obnoxious to any principle of law or public policy. They are not surplusage. They are not in conflict with any other provisions in or words of the policies. They may be read harmoniously in connection with the other and subsequent clauses, and, when so read, become a material intelligent part of the contracts. They were inserted for a purpose, intended to have a meaning, are not of doubtful or uncertain import, and, when fairly and reasonably applied they exempt the companies for loss by fire when the fire is caused by riot. In the construction of policies the same rule obtains as do in the construction of other contracts, with the exception that a policy will be construed in favor of the insured so as not to defeat, without plain necessity, his claim to the indemnity which in taking the insurance it was his object to secure; and, when the words are fairly susceptible of two interpretations, that which will sustain his claim and cover the loss must by preference be adopted. It may also be said that ambiguities, and words, sentences, or clauses of doubtful meaning, will be construed against the insurer; and this for the reason so often declared that the companies themselves prepare the policies with great care and deliberation, and, as the insured has no election except to accept them as prepared and presented to him, it is fair that they should be construed most strongly against the insurer and most liberally in favor of the insured, so that the purpose for which the insurance was obtained may be effectuated, if this can be done without doing violence to the contract. It is also a familiar principle everywhere recognized in the construction of contracts, including contracts of insur-

ance, that the intention of the parties is to be gathered from an inspection of the entire instrument; and that all parts of it, and all words employed, should be given meaning and effect if this can be done. May on Insurance, section 175; Joyce on Insurance, section 271; American Accident Co. v. Reigart, 94 Ky. 547, 23 S. W. 191, 15 Ky. Law Rep. 469, 21 L. R. A. 651, 42 Am. St. Rep. 374; Chandler v. St. Paul Ins. Co., 21 Minn. 85, 18 Am. Rep. 385; Germania Fire Ins. Co. v. Roost, 55 Ohio St. 581, 45 N. E. 1097, 36 L. R. A. 236, 60 Am. St. Rep. 711; Mutual Benefit Life Ins. Co. v. Dunn, 106 Ky. 591, 51 S. W. 20, 21 Ky. Law Rep. 213; Imperial Fire Ins. Co. v. County of Coos, 151 U. S. 452, 14 Supp. Ct. 379, 38 L. Ed. 231; Mouler v. American Ins. Co., 111 U. S. 708, 4 Sup. Ct. 466, 28 L. Ed. 447; Aetna Ins. Co. v. Jackson, 16 B. Mon. 242.

The views herein expressed as to the proper construction of the contracts and the consequent exemption of the companies from liability is fully sustained by the opinion of the United States Circuit Court of Appeals in Williamsburg City Fire Ins. Co. v. Willard, 164 Fed. 404, Heuer v. N. W. Nat. Ins. Co., 144 Ill. 393, 33 N. E. 411, 19 L. R. A. 594; Hustace v. Phœnix Ins. Co. of Brooklyn, 175 N. Y. 292, 67 N. E. 592, 62 L. R. A. 651; Germania Fire Ins. Co. v. Roost, 55 Ohio St. 581, 45 N. E. 1097, 36 L. R. A. 236, 60 Am. St. Rep. 711; Imperial Ins. Co. v. Fargo, 95 U. S. 227, 24 L. Ed. 430, and by the opinion of this court in Montgomery v. Firemen Ins. Co., 16 B. Mon. 427. In that case the boat was set on fire and burned by the bursting of the boiler. The contention of the insured was that the excepting clause merely relieved the company from liability for loss arising from the damage caused by the bursting of the boiler, and not from loss occasioned by fire that resulted from the

bursting of the boiler. But the company was held not liable; the court ruling that the exception in the policy saved it from liability for fire that was directly caused by the bursting of the boiler, the contract of insurance and the excepting clause being in all substantial particulars like the contracts here involved. The contract described the perils or risks undertaken by the insurer as set out in the opinion states that: ''They are of rivers, fire, enemies, pirates, assailing thieves, etc. And after the usual clause authorizing the insured in case of loss or misfortune to labor, travel, etc., for the defense, recovery, etc., of the boat, follows a clause by which it is agreed that this insurance company is not liable for any loss or damage which may arise from, or be occasioned by, the said boat being unduly laden, nor for any loss arising from the explosion of gunpowder, the bursting of boilers, the collapsing of the flues, or breaking of the engine, or any part thereof, except from unavoidable external cause or causes.' '' Said the court: ''We think there is no room for reasonable doubt on the evidence that the fire which actually destroyed the boat was caused directly and immediately by the bursting of the boiler. * * * The argument is that loss by fire being expressly, and loss by bursting of boilers impliedly, included among the perils insured against, and the insurer being by the succeeding clause exempt from liability for loss by bursting of boilers only, the liability for loss by fire remains, whatever may have been the cause of the fire, because the insurance against loss by fire is not restricted by any reference to the cause which may produce it; that the clause containing the exemption is an exception of hazards or losses of a particular description from the general undertaking of the insurer, which must have been under-

stood as including them, and that, as the description
of the perils insured against should be liberally con-
strued to effectuate the expected indemnity, the same
reason requires that the exception inserted by the
insurer for his own benefit should be construed
strictly, and forbids the exemption of the insurer from
his express undertaking without the express excep-
tion of a loss within that undertaking. * * * We
think, that, when it is plainly said in the negative
clause that the company is not liable for any loss
arising from the bursting of boilers, the insured must
have understood this language according to its obvi-
ous meaning, and could not have expected the com-
pany to be liable for any loss arising from the burst-
ing of boilers, and that, although the burning of the
boat or any injury by fire does not always nor often
attend the bursting of its boilers, yet as he must have
known that it did sometimes or at least that it might
sometimes be the necessary and inevitable consequence
of that cause, and as he must have understood that a
loss so happening would be a loss arising from the
bursting of boilers, he could not have expected the
company to be liable for such loss, when it was ex-
pressly agreed that they were not liable for any loss
arising from the bursting of boilers. Even if the
policy had expressly insured against the bursting of
boilers as well as against fire, it would not have oc-
curred to any ordinary mind that the comprehensive
declaration that the company is not liable for any loss
arising from the bursting of boilers should be re-
stricted to the immediate effects of the explosive
force of the steam, and would not embrace a loss by
fire, although it should be in fact the necessary and
immediate consequence and attendant of the actual
explosion. As the company did not in terms assume

the peril of any loss arising from the bursting of boilers, there is no reason on the face of the policy why the declaration of non-liability for any such loss, if regarded as an exception to a liability which would otherwise exist, should not be understood as an exception to the liability for a loss by fire necessarily and immediately caused by the bursting of boilers.''

We have endeavored to point out that it was intended by the contracts to exempt the insurer from liability from loss by fire caused by riot, and that the policies when read as a whole have this effect, and have shown that this interpretation is supported by ample authority. But it is strongly pressed upon us by counsel for appellee that the words upon which the exemption is based do not have the effect intended, and that the construction contended for by the companies is not only unreasonable, but at variance with respectable authority. The argument is made: That, if the companies intended to protect themselves from loss by fire caused by riot, they should have inserted in and as a part of the clause the words ''by fire,'' so that it would read: ''This company shall not be liable for loss by fire caused directly or indirectly by invasions, insurrection, riot, civil war, or commotion, or military or usurped power, or by order of any civil authority. * * *'' That the clause as written only exempts the companies from loss caused by invasion, insurrection, riot, civil war, or commotion, or military or usurped power, or by authority of any civil authority, independent of fire. That the words ''except as hereinafter provided,'' in the sentence before mentioned, mean, when applied to the excepting clause, that the insurer shall not be liable for loss caused by riot alone, but not loss caused by fire that is the result of the riot. This construction, as we have heretofore

noted, does violence to the meaning of the contract, and renders utterly meaningless the words "except as hereinafter provided." But, as counsel for appellee has furnished us with some authority that apparently supports his contention, we will notice the cases relied upon.

The principal case depended upon to support the contention of appellee is Commercial Insurance Co. v. Robinson, 64 Ill. 265, 16 Am. Rep. 557. The policy in that case provided that the company should not be liable "for any loss or damage by fire caused by means of an invasion, insurrection, riot, civil commotion, or military or usurped power * * * nor for any loss caused by the explosion of gunpowder, camphine, or any explosive substance, or explosion of any kind." It was contended for the company that this clause protected it from liability from any loss by fire if the fire was produced by an explosion. On the other hand, it was argued for the insured that the clause protected the company only against loss occasioned directly by an explosion, and not against loss from fire where the fire was caused by an explosion. In considering the case the court said: "It will be observed that in a clause of the policy preceding the one under consideration the company stipulated that it should not be liable for any loss or damage by fire caused by means of an invasion insurrection,' etc. Here exemption is specially secured against liability for losses by fire caused in a certain manner. But the clause under consideration leaves out the words 'by fire.' It secures exemption from liability for losses caused by explosion, but not from liability for losses by fire caused by explosion. The difference in phraseology between the two clauses is so marked that, when we consider their connection with each other, we

can not resist the conclusion that the difference was intended.  *  *  *  But, say the counsel for appellant, this company does not profess to insure against losses by explosion, but only by fire, and the clause, construed as we construe it, is unmeaning, or, at least, useless; but not so.  The clause was designed to apply to all · cases where the explosion was the immediate cause of the loss.  Suppose fire is carelessly applied to powder or other explosive substance.  An explosion follows which rends furniture and building.  This explosion is the result of the ignition of the explosive material, and it might be claimed that the loss caused thereby was a loss caused by fire.  The courts might not so hold, independently of the clause in the policy, but we can well understand, when we examine these policies, that the insurers may have introduced this clause for the purpose of leaving no room for argument or doubt.  Again, suppose a case where a fire is speedily subdued, but before it is, it has ignited powder, and an explosion has taken place which has caused much damage, but has not extended the fire.  In such a case the company would claim they were protected by this clause from the liability for the consequences of the explosion.''  We gather from this opinion that the ground upon which the court held the company liable was due to the peculiar phaseology of the exemption clauses, as in one clause the words ''by fire'' were inserted, and in the other omitted, thereby leaving room for doubt whether or not it was intended to exempt the company from liability for fire caused by explosion; and to the further fact that explosion and fire are often so closely identified, as when the fire follows an explosion or an explosion follows the fire, that it was deemed prudent to insert a provision exempting the company from liability for

loss caused by the explosion as distinct from the loss caused by the fire,

In Heffron v. Kittaning Ins. Co., 132 Pa. 580, 20 Atl. 698, the exemption clause was the same as the one in the Robinson case. Here, as in the Robinson case, the fire was caused by an explosion; and the court followed the reasoning in that case. As illustrating that no little importance was attached to the fact that the fire was caused by an explosion, and for that reason the exemption clause was strictly construed against the company ,the court said: "Indeed, damage by these two instrumentalities—that is fire and explosion— are so quite alike that the two are very naturally associated together, and may well appear in conjunction with each other in the midst of excepted losses by fire. Nor are losses by explosion foreign to the risks assumed by insurance against fire. They are like the damages by smoke and water, losses by theft, destruction by the falling of buildings, or injury by fire agencies, without actual ignition, all of which are to be found among the losses excepted against in clauses in policies of insurance similar to the one under consideration. Losses by explosions, as by concussions merely, which we find joined together in this policy, are thus proper subjects of exceptions from the general liability assumed thereby, and there is nothing which requires us to hold that more than this was intended to be covered." In the case of Boatman's Fire & Marine Ins. Co. v. Parker, 23 Ohio St. 85, 13 Am. Rep. 228, the fire was also caused by an explosion. The exemption clause was similar to the one in the Robinson case, and the court in holding the company liable turned its decision largely on the wording of the exemption clause; thus distinguishing the case from the United Life, Fire &

Marine Ins. Co. v. Foote, 22 Ohio St. 340, 10 Am. Rep. 735, in which the same court reached a different conclusion.

Other cases might be cited in which the courts have construed ambiguous exemption clauses against the insurer properly resolving all questions of doubtful construction in favor of the insured; but it would serve no useful purpose to further extend this opinion in distinguishing this class of cases from the ones before us. If we were in doubt as to the correct construction of these policies, we would resolve the doubt in favor of the insured. If the policies were reasonably susceptible of two constructions, we would give them that construction that would save the risk of the policy holder. But, as in our opinion the contracts are not fairly open to any construction other than the one we have given them, the judgment of the lower court in each case must be reversed, with directions to overrule the demurrer to the answer as amended in each case, and for further proceedings in conformity with this opinion.