## Heltsley v. Life & Casualty Ins. Co.

Feb. 13, 1945.

T. D. Hewlett and ·Fox & Gordon for appellant.

Charles G. Franklin for appellee.

OPINION OF THE COURT BY JUDGE HARRIS—Affirming.

By the terms of its policy of insurance, the appellee agreed to pay the appellant the sum of $1,000 in the event of the accidental death of her son, Virgil Welborn, unless he had alcoholic or intoxicating liquor physically present in his body at the time of the accident. The son having been killed in an automobile accident and the appellee having declined to pay, the appellant instituted the present action which, by agreement of the parties, was tried before the court without the intervention of a jury. As finally submitted, only two questions, one of fact and one of law, were open for determination; (1) Did the insured have alcoholic or intoxicating liquor physically present in his body at the time of the accident? (2) is the policy provision mentioned above contrary to public policy or unreasonable? The court found that the insured did have alcoholic or intoxicating liquor physically present in his body at the time of the accident and adjudged that the provision in question was not unreasonable nor contrary to public policy, and dismissed the appellant's petition. Hence, this appeal.

To sustain the burden which it bore of proving that the insured did have alcoholic or intoxicating liquor physically present in his body at the time of the accident, the appellee introduced three witnesses, the pertinent portions of whose testimony we quote.

S. C. Belt: "Q. How fast were they driving when they passed you? A. I don't know, but at a very high rate of speed. The car made about three turns and threw this boy out. I rode on down there in a hurry. I

met Craig Riddle and his wife coming up the hill horseback and they turned and went back right behind me. I was about the first man to this fellow that died.

"Q. That was Virgil Welborn? A. Yes, sir. I dipped my handkerchief in a puddle of water in a field close by and washed his face, and an old man brought some cold water. He was kneeling down over this boy. He breathed the old, sour liquor breath in my face. I said to this old man, 'there ain't no use washing his face, he is almost dead now.' He had a hole in his head. We could not revive him. He would belch this sour liquor in my face.

"Q. You know alcoholic or intoxicating liquor when you smell it? A. I do.

"Q. State whether or not he had intoxicating liquor on his breath? A. Yes, sir."

Dr. F. P. Strother: "Q. At the time, while you were examining him, did you smell intoxicating liquor on his breath? A. Yes, I did.

"Q. In your opinion, state whether he had intoxicating liquor in his body to some extent at that time? A. I smelled it on his breath, and I naturally inferred that he did.

"Q. It is your opinion that he did have? A. It is my opinion."

J. C. Riddle: "A. * * * When the car hit this mud on the shoulder, the driver evidently attempted to pull it back onto the highway, and he did, but it got completely out of control across the road and headed right toward me and went off the highway about ten feet behind me. This embankment was about five feet high and the car headed straight forward the first time and turned a somersault and then rolled over three or four times on its side and stopped fifty or sixty feet out in a wheat field. When it went off the highway and after it turned over the first time, one of the doors flew off and something fell out, and it proved to be the man after we got down there.

"Q. How close did you get to him? A. I took out my handkerchief and went over to the ditch and wet it and bathed his face. He looked like he was choking, and when I saw there was nothing I could do for him, I jumped on my horse and went to the telephone and called

the sheriff to send an ambulance, because I thought it was a case for the sheriff.

"Q. Do you know whether or not at that time he had intoxicating liquor on his breath—in his body? A. I don't think there was any question about it. He was choking and gagging and you could smell it all over him and all around him.

"Q. Could you smell it when he would gag and cough? A. Yes, sir.

"Q. Do you tell the court that he had a strong odor of intoxicating liquor on his breath? A. I am sure that there was no question about it.

"Q. You know he had it? A. Yes, sir."

The witnesses for the appellant testified, in substance, that they could not or did not smell any intoxicating liquor on Welborn and that he had not been drinking so far as they could tell. Under this testimony the court was not authorized to say as a matter of law that Welborn did have or did not have intoxicating liquor physically present in his body at the time of the accident. It was clearly a question of fact, and the evidence introduced on behalf of the appellee being sufficient to sustain the trial judge's finding, we are not authorized to disturb it. Hawkins v. Midland Flour Milling Co., 236 Ky. 803, 34 S. W. 2d 439; Wells v. Board of Drainage Com'rs, 237 Ky. 539, 35 S. W. 2d 886.

The exact language of the policy provision under consideration is: "* * * nor does it cover loss or injury sustained by the insured while he has physically present in his body alcoholic or intoxicating liquors in any degree. * * *" That this provision is not contrary to public policy; that it is not susceptible of double construction or of an interpretation that the extent or degree of intoxication is material; that it is not unreasonable, and that it does not constitute a limitation unavailable to appellee, is amply affirmed by the authorities both local and foreign. In Robinson & Son v. Jones, 254 Ky. 637, 72 S. W. 2d 16, 19, it is said: "It is known of all men that the drinking of intoxicating liquor, though it be not done to the extent of actual intoxication, begets a spirit of recklessness, and is responsible for numerous accidents." And in Equitable Life Assurance Society of United States v. Adams, 259

Ky. 726, 83 S. W. 2d 461, 464, ''It is the duty of the courts to take the words of an insurance policy as they are found in it, and as persons with usual and ordinary understanding would construe them when used to express the purpose for which they were employed, * * *.'' In the case of Fidelity & Casualty Co. of New York v. Palmer Hotel Co., 179 Ky. 518, 200 S. W. 923, 925, L. R. A. 1918C, 808, a passenger sued and obtained judgment against the hotel company on account of injuries which he received as the result of structural defects in the elevator itself and not as the result of any negligence on the part of the operator of the elevator. The hotel company then sought reimbursement from the insurance company under a policy by which the insurance company had obligated itself to indemnify the hotel company against any loss it might sustain on account of injury or death suffered by any person while a passenger in its elevator, subject to the condition that if any injury occurred to any person in or about the elevator while it was being operated by one under age fixed by law for elevator operators, then the insurer was not to be liable. In its defense of the action the insurance company plead the provision mentioned, and further plead that at the time of the accident in question the elevator was being operated by a person under the age fixed by law for elevator operators. In disposing of the question thus presented, this court said:

''* * * The exemption of the company from liability does not depend on the fact that the injury was caused or brought about by some act of omission or commission on the part of the elevator attendant, but on the fact that a prohibited elevator attendant was operating or in charge of the elevator. When the elevator is being operated by a prohibited attendant it is wholly immaterial what cause produced or brought about the accident or injury or death to the passenger. We have laid down in a number of cases certain generally accepted rules applicable in the construction of insurance contracts which are thus stated in Spring Garden Ins. Co. v. Imperial Tobacco Co., 132 Ky. 7, 116 S. W. 234, 20 L. R. A., N. S., 277, 136 Am. St. Rep. 164, where the court said: 'The companies had the unquestioned right to insert as many reasonable provisions in the policy exempting them from liability as they thought proper or necessary. We know of no rule of law that denies to insurance companies this privilege. * * * Why, then, should these words by which the companies undertook to limit their liability be

stricken from the policies or ignored in their construction? They are not obnoxious to any principle of law or public policy. They are not surplusage. They are not in conflict with any other provisions in or words of the policies. They may be read harmoniously in connection with the other and subsequent clauses, and, when so read, become a material, intelligible part of the contract.' "

The exact question which we have here was presented in Webb v. Imperial Life Insurance Co., 216 N. C. 10, 3 S. E. 2d 428, 431. In the course of its opinion in that case, which we approve, the court said: "The defendant by the language of the policy excluded from its coverage injury suffered by the insured while he had present in his body intoxicating liquor. This was the contract between the parties, and the defendant was entitled to avoid liability upon proof that the insured had in his body, physically present, any quantity of intoxicating liquor, regardless of whether he thereby became intoxicated or not."

From what precedes, it follows that the judgment appealed from should be and it is affirmed.