# The Lycoming Fire Insurance Company *versus* Schwenk et al.

1. A policy of insurance provided that the company should not be liable " for any loss or damage by fire caused by means of an invasion, insurrection, riot, civil commotion, or military or usurped power :" *Held,* that where a breaker at a coal mine was set on fire at night by a party of men, who fired a number of shots, drove the watchman away and then burned the breaker, there was a riot within the meaning of the policy.

2. Per Green, J.—We are decidedly of the opinion that in the testimony set forth in this opinion every element of riot is found, whether at common law or under the Act of 1705.

June 7th 1880. Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey, Sterrett and Green, JJ.

Error to the Court of Common Pleas of *Northumberland county :* Of May Term 1880, No. 135.

Covenant by William Schwenk and Jacob Geise, trading as William Schwenk & Co., for the use of Henry Saylor against the Lycoming Fire Insurance Company, upon a policy of insurance upon a coal-breaker and machinery near Mount Carmel, in Northumberland county.

The defendant pleaded:—

1. That the property alleged in the declaration to have been burned and destroyed by fire " was burnt and destroyed by rioters in the perpetration of a riot and not in any other manner ;" 2. That the burning and destruction of the said property " was caused by means of a riot and not in any other.manner ;" 3. That the burning and destruction of the said property " was caused by means of a civil commotion, and not in any other manner." The defendant

pleaded further "*non est factum,* covenants performed *absque hoc* and *nil debet.*"

It was provided by the policy that the defendant should not be liable by virtue of this policy "for any loss or damage by fire caused by means of an invasion, insurrection, riot, civil commotion or military or usurped power," and also that "persons sustaining loss by fire or lightning under a policy shall give notice thereof forthwith to the secretary, and within thirty days of said loss deliver to the secretary a particular account and proof thereof, signed and sworn to by them, setting forth among other things: "Sixth, the date of the loss and the amount thereof; Seventh, how the fire originated, so far as said persons know or believe." A fire occurred on the 3d of June 1875, and a statement of the loss sworn to by William Schwenk on the 22d of June 1875, purporting to give a particular account of the loss and the origin of the fire was sent to the secretary of the company, in which among other things was the following: "A fire occurred on the 3d of June 1875, at about the hour of ten o'clock, P. M., and originated as follows, viz.: of my own personal knowledge I do not know, but the two watchmen who were in charge of the premises say that about seventy-five men came to the breaker, and while some stationed themselves as pickets, others carried wood for kindling to the boiler-house, and after saturating the wood and parts of the building with coal oil, set fire to it, and then remained and guarded the premises until they were satisfied that destruction to the breaker was certain." No notice of any other cause of the fire was ever given to the company, and on the trial the defendant contended that this was notice that the property was burned and destroyed by means of a riot, and also proved by the watchmen and others that the property was set on fire and destroyed in the manner stated in the notice.

The sixth and seventh points of the defendant with the answers of the court thereto were as follows:—

6. That if the jury believe that the breaker was destroyed by fire in the manner testified by Timothy Adams, their verdict ought to be in favor of the defendant.

Ans. "I cannot charge you as requested as a matter of law, but say to you that I have already in the general charge defined the offence of riot, and have just told you, in answer to the foregoing points of the defendant, what circumstances would be deemed a riot so as to constitute a defence to the plaintiff's claim, and I now submit the testimony of this witness with all the other evidence in the case to you from which you are to find the facts." (10th assignment of error.)

7. That if the jury believe that the breaker was destroyed by fire, and in the manner testified by Albert Ford, their verdict ought to be in favor of the defendant.

[Lycoming Fire Ins. Co. v. Schwenk.]

Ans. "I cannot charge you as requested in this point as a matter of law, but say to you that I have already in the general charge defined the offence of riot, and have just told you, in answer to the foregoing points of the defendant, what circumstances would be deemed a riot so as to constitute a defence to the plaintiffs' claim, and I now submit the testimony of this witness with all the other evidence in the case to you, from which you are to find the facts." (11th assignment of error.)

The material portions of the testimony of Adams and Ford will be found in the opinion of this court. In the general charge, the court, Rockefeller, P. J., inter alia, said :—

" [For the present I will say to you that a riot at common law is the tumultuous disturbance of the public peace by three persons or more assembling together of their own authority with the intent mutually to assist one another against any who shall oppose them in the execution of some private object and afterwards executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended is lawful or unlawful.] (1st assignment of error.) [In order to prove a riot it is necessary at common law to prove on the trial a previous unlawful assembling. It must be shown that the assembling was accompanied with some such circumstances, either of actual force or violence, or at least by such apparent tendency thereto as would inspire the people with terror, such as being armed, using threatening speeches, turbulent gestures or the like. If the assembling of persons be not accompanied with such circumstances as these, it cannot be deemed a riot, however unlawful the acts which they actually committed.] (2d assignment.)

" [Then at common law it was also necessary that there should be a tumultuous disturbance of the public peace. By that is meant, we think, a violent, turbulent, disorderly and noisy disturbance of the public peace.] (3d assignment.) Then this disturbance must be by three or more persons, and they must have assembled together of their own authority, with intent mutually to assist one another against all persons who might oppose them in the execution of some private object, as for instance in the execution of the burning down of a building or anything of that kind. Then it must be shown that they afterwards actually did execute this object in a violent and turbulent manner, to the terror of the people.

" While the law is for the court to determine, and you are bound by the instructions of the court on questions of law, yet you are to determine the facts from the evidence in the case, and you must have reference in making up your verdict to all the facts and circumstances in the evidence.

" Then if you believe the evidence, on the night of the 3d of June 1875, the plaintiffs' property was destroyed by fire. You will recollect the testimony of the witnesses on the subject as to what took place at the time that the property was destroyed for

which the plaintiffs seek to recover the insurance in this case. Timothy Adams stated that he was there, employed by the plaintiffs, William Schwenk & Co., as watchman; that on the 3d of June, at about eleven o'clock at night, he heard a noise in the bush, a rustling in the leaves. He didn't know for certain what was there but he fired his gun, and immediately after his firing it was returned by another proceeding from the direction of this noise in the woods, and presently by another shot, and then in a short time he says there was a volley fired. At one time he said there might have been fifty or seventy shots, and again he said that there might have been only four or five, six, seven or eight. What is meant by a volley was the firing of a number of shots. Then, he says, presently a number of men, probably seven or eight, came out to the breaker and he heard them talking. He was up on the plane of the breaker above them and he heard one of them asking for some wood and another asking for some coal oil; soon after that the breaker was on fire. He doesn't speak of any noise having been made by these men except the firing of the pistols, as he thought, previous to the time of setting fire to the breaker. He moved on down the plane and finally got inside of the drift and remained there a short time when he saw the men going away. He doesn't speak of their having made any noise at the time they were going away. "Then you heard the testimony of Alfred and Joseph Ford and Harriet Farley, all persons who were in the neighborhood the evening of this fire, and you will determine from these witnesses what actually did occur on that occasion. Young Mr. Ford that he saw the men coming down the railroad; that he heard them talking loudly. "[You will take into consideration all the evidence. Was this a riot? Was this a tumultuous disturbance of the public peace by three or more persons assembled there together of their own authority with intent, mutually, to assist one another against any who should oppose them in the execution of their purposes, or in burning of the breaker or other property? Did they burn the breaker and other property in a violent and turbulent manner to the terror of the people?] (4th assignment.) You heard the testimony, so far as terror is concerned, of Harriet Farley. She was on her way home from Mount Carmel. She testified as to what she heard and saw. You heard the testimony of Alfred Ford in regard to whether he was put in terror, and the testimony of Timothy Adams on the same subject. [You will determine from all the evidence whether the acts of shooting and the noise that was created by the firing of the building were violent and turbulent acts, and whether they were to the terror of the people. We think that it is not necessary that there should have been shouting or blowing of horns; that the noise caused by the shooting off of guns and pistols would be a tumultuous disturbance of the public peace.]"

The 12th assignment of error was as follows:

[Lycoming Fire Ins. Co. v. Schwenk.]

"Because the general charge of the court, as to what constitutes a riot, differs from and is in conflict with the law as is stated by the court by affirming the third and fifth points of the defendant below, which the court below affirmed to be correct to such a degree as to be contradictory and irreconcilable, and this contradiction tended to confuse and mislead the jury, and prevented them from obtaining from the charge any certain idea of what is necessary in law to constitute a riot, to wit : the court in their general charge say, ' then at common law it was also necessary that there should be a tumultuous disturbance of the public peace. By that is meant, as we think, a violent, turbulent, disorderly and noisy disturbance of the public peace, &c.' "

The following are the 3d and 5th points, with the answers of the court.

3. " That if any persons to the number of three or more shall meet together with clubs, staves or other hurtful weapons, to the terror of the peaceable people or inhabitants of this Commonwealth, and shall commit or design to commit violence or injury upon the persons or goods of any of the said inhabitants, such persons are guilty of riot."

Ans. " I answer this point as requested."

5. That noise is not a necessary element of a riot, nor is it necessary that any person should be put in actual fear, but if a number of men, to the number of three or more, banded together for the purpose of destroying the breaker of the plaintiffs, and having armed themselves with pistols or other arms or weapons, went to the said breaker with a determination and purpose to destroy it, against any resistance that the watchmen there might offer, and did actually destroy it by fire, the plaintiffs cannot, under the terms of the policy of insurance, recover in this suit, and the verdict ought to be in favor of defendant.

Ans. " Affirmed."

Verdict for plaintiffs for $2473.33, and after judgment thereon, defendant took this writ and alleged that the court erred, inter alia, as set forth in the above assignments of error.

*George Hill* and *Joshua W. Comly*, for plaintiff in error.—The definition of riot adopted by the court from Hawkins Pleas of the Crown, book 1, chap. 65, page 293, does not correctly define the common-law offence, and is not and never was the law of Pennsylvania: 3 Coke's Inst. 176; 4 Blackstone Com. 146; 2 Ben. Dig. *verbum* "Riot;" Pennsylvania v. Cribbs, Add. R. 277; Commonwealth v. Dupuy, Brightly's R. 46; Lewis's U. S. Crim. Law 72; Shouse v. Commonwealth, 5 Barr 83; Act of 1705, 1 Bioren's Laws 30; Act of March 31st 1860, Pamph. L. 389.

If the breaker, structure and machinery of the defendant were unlawfully burnt by three or more men, banded together for that

purpose, they were burnt and destroyed by means of a riot within the terms of the exception in the policy of insurance, and the court below erred in not so telling the jury, instead of instructing them that they must find that the assembling of the offenders was accompanied with such circumstances as inspired the people with terror, and that there was a violent, turbulent, disorderly and noisy disturbance of the peace.

The testimony of either Timothy Adams or of Alfred Ford, standing alone, if believed by the jury, proved the case of a flagrant riot, and if the counsel for the plaintiff in error understand the reason of the court below for refusing to affirm the sixth and seventh points of the defendant below, it was because the court considered it to be their duty to leave all the evidence to the jury to find "whether the acts of shooting, and the noise that was created by the firing of the building were violent and turbulent acts, and whether they were to the terror of the people," and whether there was a tumultuous disturbance of the peace.

In the general charge, the court stated certain essentials, in their opinion, without which a riot cannot exist or be proved, but in affirming the third and fifth points of the defendant below, they admit the possible existence of riot in which some of the elements, declared to be essential, are wanting. This was calculated to confuse and mislead the jury.

*S. P. Wolverton* and *J. B. Packer*, for defendants in error.— The definition of riot by the court below is abundantly sustained by authority: 2 Russell on Crimes 247; Roscoe on Crim. Ev. 725; 3 Wharton's Criminal Law 153, sect. 2474, 6th ed.; King, P. J., in case In re Riots of 1844, 2 Clark 278; Angell on Fire and Life Insurance, sect. 136; Langdall *v.* Mason, Park on Insurance 965, 8th Eng. ed. There was not a riot, nor was the destruction caused by means of a riot within the words of the policy. The men who burned the breaker were incendiaries, not rioters. They proceeded quietly to the breaker and left it without noise or violence.

The testimony of Adams and Ford clearly show that the breaker was not burned by men engaged in a riot, and the court could not have affirmed the defendant's sixth point without committing manifest error. As there is no statute defining riot in Pennsylvania, and the common law is still in force, it was the duty of the court to define and explain riot at common law. In doing this the court adopted the definitions approved by all writers on criminal law. After explaining riot at common law, they accepted the definition drawn by the defendants' counsel affirming their third, fourth and fifth points.

Mr. Justice GREEN delivered the opinion of the court, June 14th 1880.

[Lycoming Fire Ins. Co. v. Schwenk.]

The defendant's sixth point requested the court to say "that if the jury believe that the breaker was destroyed by fire in the manner testified by Timothy Adams, their verdict ought to be in favor of the defendant." The seventh point made a similar request as to the testimony of Alfred Ford. Adams had testified that at about eleven o'clock at night, while he was watching at the breaker, " there was a lot of men came up to the breaker through the woods. I first heard them, and I fired a shot; they fired too; they returned the fire and came up right away and set fire to the breaker. I seen some of them; now I couldn't tell you how many I seen that was there. I didn't see any before the breaker was on fire; I seen then may be eight or ten; I can't tell how far they were away from the breaker when they commenced shooting; may be fifty yards or so; they didn't make much noise."

Q. "What amount of shooting was done?" A. "It was a regular volley. I think may be there was fifty shots fired altogether; I heard them coming in the direction of the breaker. * * * I did not go down until they had the breaker on fire; they came right up after the shooting and set fire to the breaker; after they set fire to the breaker I came down and went into the drift. * * * I didn't hear them say much, only when they came they said 'Get out of this;' that is about all I think I heard."

Q. "How did they set fire to it?" A. "They got some fine kindling wood and poured some coal oil on; they hollered for it; one hollered for wood; and the other said 'give me that coal oil;' that I heard; then they set it on fire; it burned pretty rapidly. * * * I can't say I was afraid; I didn't like to stay in the breaker any how; I didn't want to be burned up. * * * I was not in danger of being shot, because I was inside of the breaker; they couldn't shoot through. I was more in danger of the fire than from being shot; I crawled down the plane over their heads."

Ford testified that he also was a watchman at the breaker on the night of the fire, and was in the office immediately before the fire, and heard four shots fired one at a time, and then there was a silence. "After I heard the four shots then there was a lot fired just about I guess ten or fifteen yards from me; lot of shots, sounded to me like a volley of them. * * * After the shots were fired they plunged into the office, one of the men as soon as that volley of shots was fired, and asked who was there, but there was nobody there; I wasn't in the office at the time; I saw him coming into the office from the back window; I didn't see anybody else there at the time; I heard him ask who was there; I didn't make any answer to the question; I wouldn't have been here if I had, I guess; I went back of the office down in the bush and concealed myself. * * * I wouldn't like to fight against so many men."

We are decidedly of the opinion that in the foregoing testimony

[Lycoming Fire Ins. Co. *v.* Schwenk.]

every element of riot is found, whether at common law or under our Act of 1705. There was the unlawful assemblage of three or more persons combined together to perpetrate an outrageous and violent crime. The commission of the crime was immediately preceded by numerous discharges of firearms. Two peaceable citizens engaged in watching and protecting the premises, placed there for that purpose, were compelled to flee therefrom in terror of their lives. The crime was arson, one of the most odious known to the criminal law. It was committed at a late hour of the night, when the great majority of persons are in their beds and asleep and least prepared to defend themselves or their property. It is an offence having a more natural and necessary tendency to put whole communities in fear and terror than almost any other. In this instance it was accompanied by the voices of men calling for wood and oil with which to apply the fire, by the loud and appalling noise of exploding weapons of destruction, and the criminals themselves were a band of men whose numbers could not be determined on account of the darkness of the night. For a court in charging a jury to speak of such an occurrence as anything less than a riot of the most marked and distinct character would be simply to mislead them. We think the learned judge of the court below, in his comments to the jury, dealt quite too leniently with the plain and undisputed facts of the case. He said to them that to prove a riot there must be a previous unlawful assembling, accompanied with circumstances of force or violence, and "that if the assembling of persons be not accompanied with such circumstances as these it cannot be deemed a riot, however unlawful the acts which they actually committed." From this the jury would naturally infer that unless the proof went back to the time when the men first met together, and established that such original meeting was attended with circumstances of actual force and violence, a case of riot could not be made out, no matter what acts of outrage and violence were subsequently perpetrated. Such is not the law as we understand it, and we consider it error to say or to intimate that it is to a jury charged with the trial of such a case. We think, too, that the court rather overstated the necessity of proving "a violent turbulent, disorderly and noisy disturbance of the public peace" in order to make out a case of riot. There was no controversy as to what were the facts; not a witness was called to give any other account of the occurrence than that testified to by Adams and Alfred Ford. Their credibility was not assailed or impeached in any manner. It was a case in which it would have been entirely proper for the court to characterize directly the criminal aspect of the facts testified to by the witnesses named. Instead of doing this the learned judge told the jury they must decide whether they believed the witnesses when there was not a shadow of doubt thrown upon their credibility; and if they believe them they are to "determine the

[Lycoming Fire Ins. Co. v. Schwenk.]

facts and circumstances." Whether the facts and circumstances constituted a riot he did not tell them, although expressly requested to do so in two points. In our opinion he should have affirmed the defendant's sixth and seventh points without qualification. For not doing so he was in error, as also in the general charge for the reasons heretofore stated. We sustain the second, tenth, eleventh and twelfth assignments of error, and on these the case is reversed.

Judgment reversed.