**BITUMINOUS CASUALTY CORPORA-TION, Appellee and Cross-Appellant,**

v.

**James T. LYNN, Secretary of Housing and Urban Development, Appellant and Cross-Appellee.**

**Nos. 73-2043, 73-2044.**

United States Court of Appeals, Sixth Circuit.

Decided Oct. 2, 1974.

McCree, Circuit Judge, filed an opinion concurring in part and dissenting in part.

Michael H. Stein, Appellate Section, Civil Div., Dept. of Justice, Washington, D.C., for appellant and cross-appellee; Irving Jaffe, Acting Asst. Atty. Gen., Washington, D. C., Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., William Kanter, Atty., Dept. of Justice, Washington, D. C., on brief.

Arnold M. Weiner, Baltimore, Md., for appellee and cross-appellant; Robert E. Cahill, Baltimore, Md., Charles Landrum, Jr., Lexington, Ky., on brief.

Before PHILLIPS, Chief Judge, and McCREE, and ENGEL, Circuit Judges.

PHILLIPS, Chief Judge.

This is an action to recover on a contract of reinsurance issued by the Department of Housing and Urban Development to Bituminous Casualty Corporation pursuant to the Urban Property Protection and Reinsurance Act of 1968, 12 U.S.C. §§ 1749bbb–1 to 1749bbb–21.

In case No. 73–2043 the Secretary appeals from the judgment of the District Court awarding a recovery to Bituminous under its contract in the amount of $372,167.58 plus interest at six per cent per annum from the date of the judgment. In case No. 73–2044 Bituminous cross-appeals from the disallowance of pre-judgment interest from the date of the denial of its claim.

We affirm as to the judgment allowing recovery on the claim and the award of post-judgment interest and reverse as to the denial of pre-judgment interest.

The events giving rise to the claim against the Secretary of HUD were summarized by District Judge Bernard T. Moynahan, Jr., as follows:

"The claim arises from the violent destruction, during the night of Au-

gust 24–25, 1968, of certain heavy mining equipment owned by Clairfield Equipment Company, Inc. ('Clairfield') and located at a mining site on Red Bird mountain in Leslie County, Kentucky. The destroyed equipment had been insured against loss, including loss from riot, by an inland marine policy issued by Bituminous to Clairfield. The premium paid by Clairfield to Bituminous for this policy was included in the total of inland marine premiums on which the Secretary calculated the premiums for the reinsurance contract.

"Clairfield was owned and controlled by the U. R. Arnold family. The insured equipment, was leased to two corporations, also operated by the Arnolds, which operated a strip mine and a deep mine at the site involved here. Approximately twenty employees, members of the Southern Labor Union, worked at these mines. The Arnolds also employed a local resident to act as watchman and to guard the mine and equipment after working hours.

"At approximately 10:00 P.M., on the night of August 24, 1968, an armed gang of three or four men descended upon the watchman, assaulting him and forcibly removing from his person the guns which he had used to protect the mines and equipment. He was thrown to the ground, kicked about the head and told that he might be killed. The gang forcibly broke into a trailer containing high explosives, and, for more than four hours, with the watchman bound and blindfolded, they planted the explosives beneath every piece of valuable equipment on the site. As they went about their task, the gang continued to threaten the watchman and at one point some of them suggested that he be tied to the equipment and destroyed along with it. The destruction was accomplished by a prolonged series of explosions. The first of the blasts terrorized not only the watchman, but the members of the gang as well. A separate fuse was lit beneath each piece, and, for a sustained period, the mountain was shaken by a sequence of blasts. Persons living in the vicinity, including those on the other side of the mountain, as much as five miles away, were awakened and frightened by the tumult. The explosions were so violent that their houses were shaken. It appeared to some that 'the mountain was a ball of fire' and to others that 'the sky was lit up'."

Bituminous had purchased a standard form riot reinsurance policy from the Secretary. The policy provided:

"Pursuant to the provisions of the Urban Property Protection and Reinsurance Act of 1968 and subject to the terms and conditions herein set forth, the REINSURER hereby obligates itself to pay, as reinsurance of the COMPANY, the amount of the COMPANY'S excess aggregate losses resulting from riots or civil disorders in such lines of mandatory and optional coverage as may be designated herein separately for each State."

Clause XV(2) defined "riots or civil disorders" to mean:

"a.  any tumultuous disturbance of the public peace by three or more persons mutually assisting one another in execution of a common purpose by the unlawful use of force and violence resulting in property damage of any kind;

"b.  two or more unlawful and terroristic acts or occurrences which, under similar circumstances, take place within reasonable proximity as to time and place, at least two of which acts or occurrences each result in property damage of any kind in excess of $1,000 or;

"c.  any other unlawful and terroristic act or occurrence, resulting in property damage of any kind, which may reasonably be determined by the REINSURER, on the basis of evidence submitted by the COMPANY, to have been,

under the circumstances, a form of civil disorder."

Bituminous submitted its claim to HUD which summarily rejected it because "it [did] not appear that this loss arose incident to a riot or civil disorder as defined in the Standard Reinsurance Contract." After Bituminous requested reconsideration of the denial of its claim, HUD amplified its reasons for the denial:

"Nevertheless, it was the recommendation of our internal Claims Review Committee, and my ultimate decision as Administrator, that the type of loss involved was not one covered, or intended by the Congress to be covered, under the Standard Reinsurance Contract. It was our conclusion that the loss resulted from traditional malicious mischief rather than from the type of riot or civil disorder envisaged by the Urban Property Protection and Reinsurance Act of 1968.

"Specifically, the Congress, in broadening the scope of the program from the catastrophic coverage originally contemplated, stated:

"*It has been pointed out* that there has *recently* been a pattern of losses resulting from intentionally caused fire or other property damage which may or may not be connected in time or place to riots or group activity, but which could be determined to be a form of civil disorder. It is the view of the committee that losses of this nature might be considered by the Secretary when he issues regulations delineating the precise scope of 'losses resulting from riots or civil disorders.' (Emphasis supplied.) House Report No. 1585, Committee on Banking and Currency, 90th Congress, 2d Session, p. 80.

"Both the testimony which led to the expansion of the scope of the Act, and the reference in the Committee Report to the *recent* pattern of intentionally-caused losses, make clear that the types of civil disorder intended to be covered were isolated or related acts of terrorism directed at an identifiable population or significant segment thereof by militant groups, often having racial cause, but having in common a primary motivation of civil protest or civil disruption; as distinguished, for example, from destructive acts directed toward a single employer or organization (as is typical of labor disputes), and particularly as distinguished from isolated acts which do not involve, either directly or indirectly, a community or a population. In summary, what we believe the Congress intended, and what we certainly intended by the (B) and (C) definitions of our Contract, was coverage primarily for terroristic acts affecting a population, which cause property damage, but which fall short of the mass riots which occurred in Watts, Newark, and Detroit, for example. Under the circumstances presented, where motive is unknown, the possibly related acts were distant both in time and place, and no population was affected, we do not believe that we can stretch either the intention of the Congress or the wording of the Contract to provide the reinsurance coverage you seek."

Thereupon, Bituminous filed suit pursuant to the provisions for judicial review set forth in 12 U.S.C. § 1749bbb–11(b)(1).[1] There being no dispute as to any material fact, both parties moved for summary judgment. The District Court in an amended memorandum opinion, held that the loss was covered under paragraphs (a) and (b) of clause

1. "Upon disallowance of any claim under color of reinsurance made available under this subchapter, or upon refusal of the claimant to accept the amount allowed upon any such claim, the claimant may institute an action against the Secretary on such claim in the United States district court for the district in which a major portion (in terms of value) of the claim arose."

XV(2), *supra*, awarded post-judgment interest and denied pre-judgment interest.

### 1) LIABILITY

It has not been disputed that the definition contained in paragraph (a), *supra*, corresponds with the common law description of a riot. *See* Providence Washington Insurance Co. v. Lynn, 492 F.2d 979 (1st Cir. 1974). *See also generally* 54 Am.Jur.2d Mobs and Riots § 1 (1971); Annotation, 121 A.L.R. 250.

The Secretary's argument proceeds on two theories: (1) The definition of riot should be construed narrowly so as to make it consistent with the legislative intent underlying the reinsurance program; and (2) the acts giving rise to the loss, in any event, do not constitute a common law riot.

While admitting that the Act and the reinsurance contract were designed to cover losses sustained in rural as well as urban areas, the Secretary contends that they were designed to provide protection against riots such as those that occurred in the 1960's. In adopting this position, the Secretary would have us read a "motivation" element into the contract definition of a riot. Specifically, it is argued that the riot must be motivated by social or political reasons and not by "labor strife unrelated to . . . ideological or racial disturbances." We do not read the contract so narrowly.

■■■ As a general rule, contracts of the United States are governed by federal law. United States v. Seckinger, 397 U.S. 203, 209–210, 90 S.Ct. 880, 25 L. Ed.2d 224 (1970); S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564, 66 S.Ct. 749, 90 L.Ed. 851 (1946); Clearfield Trust Co. v. United States, 318 U.S. 363, 366–367, 63 S.Ct. 573, 87 L.Ed. 838 (1943). However, where Congress has not adopted a different standard, it is customary to apply the principles of general contract law. Priebe and Sons, Inc. v. United States, 332 U.S. 407, 411, 68 S. Ct. 123, 92 L.Ed. 32 (1947). Indeed, the rules governing federal contracts are derived from the common law. As stated by the Supreme Court in *Seckinger, supra*:

"In fashioning a federal rule we are, of course, guided by the general principles that have evolved concerning the interpretation of contractual provisions such as that involved here. Among these principles is the general maxim that a contract should be construed most strongly against the drafter, which in his case was the United States. (Footnotes omitted.)

\* \* \* \* \* \*

"Finally, our interpretation adheres to the principle that as between two reasonable and practical constructions of an ambiguous contractual provision, such as the two proffered by the Government, the provision should be construed less favorably to that party which selected the contractual language. This principle is appropriately accorded considerable emphasis in this case because of the Government's vast economic resources and stronger bargaining position in contract negotiations." (Footnotes omitted.) 397 U.S. at 210, 216, 90 S.Ct. at 885, 887.

We are of the view that the legislative history of the Act does not show that Congress meant to adopt different rules of interpretation with respect to reinsurance contracts executed pursuant to the Act. The program was designed to be flexible with authority left to the Secretary to draft contracts which would provide coverage consistent with the purposes of the Act. 12 U.S.C. § 1749bbb–8(c). Had Congress or the Secretary desired to exclude from coverage the type of loss presented under the facts of this case, unambiguous language to that effect could have been used.

We decline to read a motivation test into the contract. Clause XV(2)(a) is unambiguous in defining the elements of a common law riot. Even if it contained an ambiguity, we would be required to resolve it against the Secretary and in favor of Bituminous. The contract was

of a standard form and was drafted by the Secretary who had a much stronger bargaining position than Bituminous. Moreover, Bituminous, along with other private companies, participated in state-wide plans of insurance in return for protection under the statutory reinsurance program. 12 U.S.C. § 1749bbb–7(c). We think these factors mandate the application of the general rule that a contract should be construed less favorably against the party that drafted it. *Seckinger, supra.*

■ More importantly, however, the allowance of a claim such as the one at bar is entirely consistent with the legislative history of the Act. The purpose of the reinsurance program was to ease the insurance crisis that existed in areas where property owners could not obtain coverage. 1968 U.S. Code Cong. & Adm. News, pp. 2951–2953. In finding that the national interest required that riot insurance be available to property owners, the Congress stated that the purposes of the Act were to:

"(1) encourage and assist the various State insurance authorities and the property insurance industry to develop and carry out statewide programs which will make necessary property insurance coverage against the fire, crime, and other perils more readily available for residential, business, and other properties meeting reasonable underwriting standards; and (2) provide a Federal program of reinsurance against abnormally high property insurance losses resulting from riots and other civil commotion, placing appropriate financial responsibility upon the States to share in such losses." Urban Property Protection and Reinsurance Act of 1968, Pub.L. No. 90–448, § 1102(b).

The record established beyond doubt that an insurance crisis exists in southeast Kentucky. As stated by District Judge Moynahan:

"Southeastern Kentucky has been plagued with an insurance crisis not unlike that which has existed in the inner cities. Because of the violence which has characterized relations within the coal industry, there has been an exodus of insurance companies from that area. Of the more than four hundred casualty companies operating in Kentucky, less than ten percent of them will accept any risk in the southeastern part of the State. Only two or three insurance companies, one of them Bituminous, will still write insurance voluntarily on coal properties. The absence of federal riot reinsurance would render property insurance virtually unavailable to the coal industry. This, in turn, would have serious adverse effect upon the ability of the industry to obtain financing and otherwise to operate."

In view of these findings of the District Court, we see no inconsistency between applying contract protection to the loss here involved and the purpose behind this legislation. To the contrary, it would appear that Congress, in drafting the statute, intended to provide protection in a case such as this one. Since we are unwilling to fashion an exception to the definition of riot contained in the contract, the sole question remaining is whether the events giving rise to the property damage fall within the contract definition.

■ The essential elements of a riot as defined in clause XV(2)(a) are: 1) a tumultuous disturbance of the public peace, 2) by three or more persons mutually assisting one another in the execution of a common purpose, 3) by the unlawful use of force and violence, 4) resulting in property damage of any kind. The issue in the case at bar concerns item 1.

Addressing itself to this issue, the District Court stated:

"There is no merit to the Defendant's further contention that the acts of the gang here did not amount to a disturbance of the public peace and that they were not tumultuous. Even if the explosions and the terrorizing

of the local population were ignored, the assaults upon the watchman were more than sufficient to amount to a tumultuous disturbance of the public peace."

The Secretary contends that "disorderly agitation or milling about of a crowd, usually with uproar and confusion of voices" is an essential part of a tumultuous disturbance. It is argued further that the events giving rise to the damage are, at the most, simple assault and malicious mischief. No authority is cited for this proposition. The authorities which we refer to below mandate a contrary conclusion.

In the only other reported appellate case cited to us interpreting clause XV(2)(a), the First Circuit held that a prison fire set secretly and away from public view was not a riot. *Providence Washington Insurance Co., supra*, 492 F.2d at 983. In analyzing the decisions, the court cited with approval the District Court's determination in the case at bar that a riot had occurred. *Id.* The distinction between the two cases was stated by the First Circuit:

"The cases wherein destructive activity has been found to be riotous have been ones where the illegal act was accompanied by the use of force, or the threat of use of force, against anyone who might interfere with the criminal enterprise. *See e. g.,* Insurance Co. of North America v. Rosenberg, 25 F.2d 635 (2d Cir. 1928); Brous v. Imperial Assur. Co., 130 Misc. 450, 224 N.Y.S. 136 (1927), aff'd, 223 App.Div. 713, 227 N.Y.S. 777 (1928); Germania Fire Ins. Co. v. Deckard, 3 Ind.App. 361, 28 N.E. 868 (1891). The only other case to construe a reinsurance contract under the National Insurance Development Program reached a conclusion consistent with these cases. In Bituminous Casualty Corp. v. Romney, (amended mem. opinion, E.D.Ky.1973), the court found a riot, as defined in a provision of the contract identical to the one in issue here, in the actions of three or four men who overpowered, bound and threatened the night watchman at a coalfield and who then destroyed valuable mining equipment with explosives. On the other hand, stealthy destructive activity accomplished without force or threat of force to those who might interfere has been found not to constitute a riot, . . ."

The significance of the watchman's presence is further illustrated in Salem Mfg. Co. v. First American Fire Ins. Co. of New York, 111 F.2d 797 (9th Cir. 1940), and Hartford Fire Insurance Co. v. War Eagle Coal Co., 295 F. 663 (4th Cir. 1924).

In Lycoming Fire Insurance Co. v. Schwenk, 95 Pa. 89, 40 Am.Rep. 629 (1880), a party of men convened in the nighttime upon a coal breaker, fired shots causing two watchmen to flee and then set fire to the breaker. The court held that these events constituted a riot.

In State v. Johnson, 43 S.C. 123, 20 S.E. 988 (1895), seven defendants were convicted of riot because they tied a man to a tree and whipped him.

In Germania Fire Insurance Co. v. Deckard, 3 Ind.App. 361, 28 N.E. 868 (1891) a group of men broke into a building at night, forced the occupants to vacate under threats of personal violence and then set fire to the building. The court held that these acts constituted a riot.

Similarly, in Spring Garden Insurance Co. v. Imperial Tobacco Co., 132 Ky. 7, 116 S.W. 234, 20 L.R.A.,N.S., 227, 136 Am.St.Rep. 164 (1909), the court found that a riot had occurred when a large group of men dynamited and burned the plaintiff's property. *See generally* 5 Appleman, Insurance Law and Practice § 3111 (1970); Annotation, 121 A.L.R. 250, *supra*.

We are of the view that these authorities mandate the conclusion that the events giving rise to the destruction of the equipment in the case at bar constituted a riot within the meaning of clause XV(2)(a) of the reinsurance contract.

2) POST-JUDGMENT INTEREST

In awarding post-judgment interest, the District Court stated:

"The federal riot reinsurance program is operated by the National Insurance Development Fund (12 U.S.C. Sec. 1748bbb–1 through 1749bbb–20). This instrumentality functions as a business entity with the capacity to sue and be sued with respect to its transactions. (12 U.S.C. Sec. 1749bbb–10 and 1749bbb–11(b)). The program is self-supporting, drawing on premium and investment income. It has been operated at a substantial profit since its inception. It is subject to the same incidents of suit, including allowance of interest, as a private business entity."

The court did not award pre-judgment interest because, in its view, the claim was not liquidated.

■ The general rule is that the United States, subject to constitutional limitations, is not liable for interest unless it is expressly authorized by contract or statute. United States v. Alcea Band of Tillamooks, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); United States v. New York Rayon Importing Co., Inc., 329 U.S. 654, 659, 67 S.Ct. 601, 91 L.Ed. 577 (1947); United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 588, 67 S.Ct. 398, 91 L.Ed. 521 (1947); United States v. Worley, 281 U.S. 339, 341, 50 S.Ct. 291, 74 L.Ed. 887 (1930); Gray v. Dukedom Bank, 216 F. 2d 108, 110 (6th Cir. 1954). See generally Annotation 24 A.L.R.2d 928, 983–96.

This rule, however, is subject to certain well defined exceptions. One of these exists when the United States embarks on a business venture with the power to "sue and be sued." In those cases it has been held that the United States has placed itself on an equal footing with private parties, including the usual incidents of suits.

■ In Standard Oil Co. v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L. Ed. 803 (1925), the United States had issued two policies of insurance against war risks. A suit was brought on the policies, and the Supreme Court, speaking through Mr. Justice Holmes, stated:

"Some question was made as to the allowance of interest. When the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business. The policies promised that claims would be paid within 30 days after complete proofs of interest and loss had been filed with the Bureau of War Risk Insurance. The proofs seem to have been filed on January 11, 1917. Interest at six per cent, should be allowed from February 11, 1917." *Id.* at 79, 45 S.Ct. at 212.

In United States v. Worley, 281 U.S. 339, 342, 50 S.Ct. 291, 293, 74 L.Ed. 887 (1930), the Supreme Court elaborated on its holding in *Standard Oil, supra,* and set forth the factors that would be necessary to justify an award of interest:

"The act authorized the Bureau to adopt and publish forms of policies and to establish reasonable rates. The policies adopted by the Bureau and used in that case contained a promise to pay losses within a specified time. Under that form of contract private underwriters are liable for interest when payment is not made as agreed. There was nothing in the statute to disclose an intention on the part of the United States to bear any part of the cost of the insurance or to give pecuniary aid to the owners of vessels or other property insured. And as a matter of fact a large profit resulted from the operation of the business. Annual Report of the Director of the U.S. Veterans' Bureau, 1923, p. 675."

Although the Court in *Worley* did not award interest, it nevertheless left the *Standard Oil* doctrine untouched by observing that the United States had

borne a large part of the cost of the insurance program. *Id.* at 343, 50 S.Ct. 291.

In Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939), the Supreme Court, speaking through Mr. Justice Frankfurter, observed that "the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work." *Id.* at 388, 59 S.Ct. at 517. After noting that the Congress could, of course, confer governmental immunity on its instrumentality, the Court declared that the absence of a "sue and be sued" clause would not be conclusive of the issue. *Id.* at 389, 59 S.Ct. 516.

In Federal Housing Administration v. Burr, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940), the Court authorized garnishment against the Federal Housing Administration. Mr. Justice Douglas, speaking for the Court, stated:

"As indicated in Keifer & Keifer v. Reconstruction Finance Corp., *supra*, we start from the premise that such waivers by Congress of governmental immunity in case of such federal instrumentalities should be liberally construed. This policy is in line with the current disfavor of the doctrine of governmental immunity from suit, as evidenced by the increasing tendency of Congress to waive the immunity where federal governmental corporations are concerned. Keifer & Keifer v. Reconstruction Finance Corp., *supra*. Hence, when Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued', it cannot be lightly assumed that restrictions on that authority are to be implied. Rather if the general authority to 'sue and be sued' is to be delimited by implied exceptions, it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference

with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense. In the absence of such showing, it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be.

"Clearly the words 'sue and be sued' in their normal connotation embrace all civil process incident to the commencement or continuance of legal proceedings." (Footnote omitted.)

In Reconstruction Finance Corp. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595 (1941), the Court again held that a "sue and be sued" clause placed the governmental instrumentality on an equal footing with private parties and would authorize the award of costs. *Id.* at 85–86, 61 S.Ct. 485. Once again, the transactions were "akin to those of private enterprises." *Id.* at 83, 61 S.Ct. at 486.

The continued vitality of these five cases is not open to question. N.L.R.B. v. Nash-Finch Co., 404 U.S. 138, 143 n. 2, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971). It is with these cases in mind that we must focus our inquiry on the propriety of interest in the case at bar.

The reinsurance program is funded by the National Insurance Development Fund. 12 U.S.C. § 1749bbb–13. The Fund is available to pay reinsurance claims, administrative expenses for the program and repay, with interest, funds borrowed from the Treasury. *Id.* The assets of the Fund are derived from premiums, fees and other charges paid by the insured companies and interest on its investments. *Id.* The self-supporting nature of this financing arrangement was set forth in the legislative history of the Act:

"The financing arrangement envisions a reinsurance program which

can be self-supporting, drawing on reinsurance premiums paid by insurance companies and payments by the States to cover losses from riots and civil disorders which exceed the losses retained by the insurance companies. If riot losses throughout the Nation resulted in reinsurance claims in excess of the aggregate amount of reinsurance premiums received by the Secretary, the excess would be paid from funds borrowed by the Secretary from the Treasury, to be repaid from future reinsurance premiums." 1968 U.S.Code Cong. & Adm.News, p. 2962. Moreover, it is undisputed that to date the program has built up a surplus of premium receipts over claim payments and administrative expenses. In short, the program was intended to be and has been self-supporting.

There are additional features of the program that point up its business-like nature. The policies are standard form reinsurance contracts that are drafted by the Secretary and provide that claims shall be paid promptly. Moreover, although Congress did not grant broad "sue and be sued" powers, it authorized the Secretary to sue for unpaid premiums and to be sued on claims. 12 U.S.C. §§ 1749bbb–10(a), 1749bbb–11(b)(1).

We find nothing in the Act or the legislative history to indicate that Congress intended to restrict these limited clauses authorizing suits by and against the Secretary so as to exclude a normal incident of suit such as interest.

In view of the self-supporting nature of the program, the fact that the transactions are akin to those of private parties and the Congressional authorization for suits on disputed claims, we hold that the Secretary is in the business of selling insurance and, for the purposes of this litigation, is on an equal footing with private parties. Thus, 12 U.S.C. § 1749bbb–11(b)(1), insofar as it authorizes suits against the Secretary on disputed claims, must be construed as being a waiver of governmental immunity on

the award of interest as an ordinary incident of suit.

We, therefore, hold that the District Court did not err in awarding post-judgment interest.

### 3) PRE-JUDGMENT INTEREST

By cross-appeal Bituminous asserts that it is entitled to interest from the date of the denial of its claim. The District Court held that the claim was unliquidated and that Bituminous was not entitled to interest prior to judgment. Bituminous asserts that its claim was based on undisputed facts, that the amount was calculable by a reference to a formula set forth in the reinsurance contract and that the claim, therefore, was liquidated.

The general rule is that interest, at the legal rate, runs as a matter of right on a liquidated claim. Royal Indemnity Co. v. United States, 313 U.S. 289, 295–297, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); *Standard Oil Co., supra,* 267 U.S. at 79, 45 S.Ct. 211, 69 L.Ed. 803; W K Contracting Co., Inc. v. Ashland Oil & Refining Co., 478 F.2d 1046, 1049 (6th Cir. 1973); *cf.* Farmers Chemical Assoc., Inc. v. Maryland Casualty Co., 421 F.2d 319, 322 (6th Cir. 1970). The issue in this case concerns whether the claim of Bituminous was liquidated.

The 1968–69 Standard Reinsurance Contract included a formula for ascertaining the loss. Under the formula, the total loss sustained was $392,439.98. In its "Excess Aggregate Loss Computation Sheet" submitted with its claim, Bituminous allocated $372,182 to be borne by the reinsurer and $20,257.98 to be borne by itself. These calculations and allocations were in accordance with the formula and, except for rounding off changes, reflect the correct amounts.

Bituminous, however, filed its claim and initiated this suit for the total amount, i. e. $392,439.98. It is undisputed that the District Court's judgment of $372,167.58 represents the amount to which Bituminous is entitled

under the policy. The $14.42 difference between this amount and Bituminous' figure of $372,182 is due to rounding off errors. The difference in the amount of the judgment and the $392,439.98 sued for is due to failure to reflect the $20,257.98 which Bituminous previously had acknowledged in writing was its obligation under the formula. An affidavit filed by the Acting Administrator for Urban Property Insurance, Federal Insurance Administration, Department of Housing and Urban Development, established that the Secretary knew that the Bituminous claim was not for $392,439.98, but rather was for $372,167.58.

When the amount of a claim can be ascertained readily by reference to a formula in the contract and none of the facts is in dispute or when the amount of the claim itself is not disputed, the claim is liquidated. *W K Contracting Co., Inc., supra; Farmers Chemical Assoc., Inc., supra;* Abell v. Anderson, 148 F.2d 372, 375 (6th Cir.), cert denied, 326 U.S. 731, 66 S.Ct. 39, 90 L.Ed. 435 (1945).

Since the amount of the claim in this case was never in dispute and could, at all times, be ascertained readily by resort to the formula in the contract, we hold that it was liquidated.

The fact that Bituminous originally asserted a claim slightly in excess of the amount to which entitled under the formula, under the circumstances adequately explained by the record in this case, is not fatal to its right to interest from the date of the denial of its liquidated claim. *Cf.* Ginsburg v. Insurance Co. of North America, 427 F.2d 1318, 1321 (6th Cir. 1970).

We hold that the Secretary is liable for pre-judgment interest at the legal rate from the date of the denial of this liquidated claim.

### 4) CONCLUSION

The judgment of the District Court is affirmed in case No. 73–2043 and is reversed in case No. 73–2044. The case is remanded with directions to allow recovery by Bituminous for pre-judgment interest from the date of the denial of the claim.

McCREE, Circuit Judge (concurring in part and dissenting in part).

I concur in the affirmance of Case No. 73–2043 but for a different reason.

The reinsurance contract provides coverage for claims arising from "riots or civil disorders" and contains the following statutory definition of these terms:

" 'riots or civil disorders' means:

a.  any tumultuous disturbances of the public peace by three or more persons mutually assisting one another in the execution of a common purpose by the unlawful use of force and violence resulting in property damage of any kind;

b.  two or more unlawful and terroristic acts or occurrences which, under similar circumstances, take place within reasonable proximity as to time and place, at least two of which acts or occurrences each result in property damage of any kind in excess of $1,000 or;

c.  any other unlawful and terroristic act or occurrence, resulting in property damage of any kind, which may reasonably be determined by the REINSURER, on the basis of evidence submitted by the COMPANY, to have been, under the circumstances, a form of civil disorder."

The opinion of the court focuses only on definition "a", although the district court held, alternatively, that there was coverage here under both "a" and "b".

I agree with the majority opinion that a motivation test should not be read into paragraph "a" and that the sole question is "whether the events giving rise to the property damage fall within the contract definition." I submit, however, that the events resulting in the destruction of property do not satisfy the element of paragraph "a" requiring a "tumultuous disturbance of the public peace." Nevertheless, I concur in the result of the

opinion because I believe that the district court was correct in its alternative holding that the paragraph "b" definition was satisfied.

In considering whether paragraph "a" was satisfied, the district court found as follows:

At approximately 10:00 P.M., on the night of August 24, 1968, an armed gang of three or four men descended upon the watchman, assaulting him and forcibly removing from his person the guns which he had used to protect the mines and equipment. He was thrown to the ground, kicked about the head and told that he might be killed. The gang forcibly broke into a trailer containing high explosives, and for more than four hours, with the watchman bound and blindfolded, they planted the explosives beneath every piece of valuable equipment on the site. As they went about their task, the gang continued to threaten the watchman, and at one point some of them suggested that he be tied to the equipment and destroyed along with it. The destruction was accomplished by a prolonged series of explosions. The first of the blasts terrorized not only the watchman, but the members of the gang as well. A separate fuse was lit beneath each piece, and for a sustained period, the mountain was shaken by a sequence of blasts. Persons living in the vicinity, including those on the other side of the mountain, as much as five miles away, were awakened and frightened by the tumult. The explosions were so violent that their houses were shaken. It appeared to some that "the mountain was a ball of fire" and to others that "the sky was lit up".

I do not believe that the violent explosions themselves constituted the required "tumult," any more than it could be contended that secretly infiltrating saboteurs who might blow up a mine stealthily would be engaging in a riot. For example, in Providence Washington Insurance Co. v. Lynn, 492 F.2d 979 (1st Cir. 1974), the court held that a fire set in "quiet and stealthy manner" was not a riot under the reinsurance contract definition. That court properly stated the general rule that "a stealthy act of destruction is not transformed into an act of riot because upon later discovery of damage there is a public disturbance." 492 F.2d at 982–983, citing 11 G. Couch, Cyclopedia of Insurance Law § 47.472 at 255. Accordingly, the sole relevant factor here in determining whether there occurred a "tumultuous disturbance of the public peace" is the assault and battery of a sole night watchman. I do not read the opinion to suggest anything to the contrary.

Yet, the opinion finds in the acts of violence committed against this watchman sufficient tumult to conclude that the element of "tumultuous disturbance of the public peace", the definition in paragraph "a", is satisfied. I am not convinced by the authorities cited in the opinion or by the ordinary meaning of the statutory language that this is so. I would hold that the circumstances giving rise to property damage here did not include a tumultuous disturbance of the public peace and that therefore the coverage under paragraph "a" is not available to Bituminous.

However, I concur in the result reached by the majority opinion because I believe the district court should be affirmed in its alternative holding, not discussed in the opinion, that the events here satisfied the paragraph "b" definition of "riots and civil disorders." The district court held:

The Court also concludes that the destruction here amounted to civil disorder within the meaning of the second policy definition quoted in paragraph 2 above. It was one of two or more unlawful and terroristic acts or occurrences, taking place within reasonable proximity as to time and place, at least two of which resulted in property damage in excess of $1,000.00. The destruction was part

of a pattern of nighttime bombings which persisted unabated in the immediate area for a period of almost a year. When the gang first seized the watchman here, they announced to him that they were "union men". U. R. Arnold had long been in dispute with the United Mine Workers, resulting from his unwillingness to accept that union as the representatives of his employees. On at least two earlier occasions he had instituted litigation as a result of violence directed against him. See, e. g., White Oak Coal Co. v. United Mine Workers, 318 F.2d 591 (6th Cir. 1963).

The court's findings in this respect are not "clearly erroneous." Fed.R.Civ.P. 52(a), and, in my view, satisfy the definition in paragraph "b". The First Circuit, in *Providence, supra,* suggested that paragraph "c" requires that "if an act of destruction is not public in the sense that it is openly done [as in a riot], it must be public in the sense of its purpose." 492 F.2d at 985. For the very same reasons stated in the opinion's rejection of a motivation test in applying paragraph "a", I have serious doubts that paragraph "b" or "c" should be interpreted to require terroristic acts with a "public purpose." And, in any event, assuming arguendo that this requirement should be placed by gloss on the statute's plain language, then I would have no difficulty concluding that a labor dispute may have a "public purpose" in any sense required under paragraphs "a" and "b".

I would remand case No. 73–2044 for more specific findings on the issue whether the claim was liquidated. I agree that the formula for ascertaining the amount in dispute was agreed upon, but it is not at all clear from the record that the amount of the loss was free from dispute. The Government contends that the amount in dispute was not finally determined until April 6, 1973, four years after the first denial of the claim. I believe we should not assume that the Secretary knew that his stated position was erroneous.